UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

TRAVELERS PROPERTY
CASUALTY COMPANY OF
AMERICA, et al.,

                    Plaintiffs,

        v.

NORTHWEST PIPE COMPANY, et al.,

                    Defendants.

CASE NO. C17-5098 BHS

ORDER DENYING PLAINTIFFS'
MOTION TO STRIKE AND
DEFENDANTS' JOINT MOTION
TO STAY AND RESERVING
RULING ON DEFENDANT'S
MOTION TO AMEND AND THE
PARTIES' MOTIONS FOR
SUMMARY JUDGMENT

This matter comes before the Court on the following motions: Defendant Norwest

Pipe Company's ("NPC") motion for partial summary judgment (Dkt. 14); Plaintiffs

Travelers Property Casualty Company of America's ("Travelers") and The Phoenix

Insurance Company's ("Phoenix") (collectively "Plaintiffs") motion for summary

judgment (Dkt. 17); NPC's and Defendant Greater Vancouver Water District's ("Water

District") (collectively "Defendants") joint motion to stay (Dkt. 21); and NPC's motion

for leave to amend its answer to the complaint (Dkt. 26).

## I.      FACTUAL BACKGROUND AND PROCEDURAL HISTORY

### A.      Underlying Dispute and Litigation Between the Water District and NPC

On August 7, 2015, the Water District commenced an action against NPC in the

Supreme Court of British Columbia. Dkt. 18-12. In that action, the Water District alleges

that it suffered damages in the construction of a large water pipeline, referred to as the "Twin Tunnels" project, arising from the alleged failure of circumferential welds that were being used to attach grout plugs to a large steel pipe liner. *Id.* Both the grout plugs and steel liner were manufactured and supplied to the Water District by NPC. *Id.* at 5. Specifically, the Water District brought the following allegations against NPC:

*Claim against Northwest Pipe*

39.  Northwest Pipe had an obligation under the Pipe Supply Contract and owed a duty of care to the GVWD to ensure that the Material that it manufactured and supplied to the GVWD conformed to the design specifications, was free from defects and was fit for the purpose for which it was to be used.

40.  Northwest Pipe breached the Pipe Supply Contract and was negligent by failing to exercise the reasonable skill, care or diligence of a competent metals fabricator, particulars of which include the following:

a.  failing to ensure that the Material that it manufactured and supplied to the GVWD conformed to the design specifications provided to Northwest Pipe;

b.  failing to ensure that the Material that it manufactured and supplied to the GVWD was free from defects;

c.  failing to ensure that the Material that it manufactured and supplied to the GVWD was fit for the purpose for which it was to be used; and

d.  such further and other particulars as may be advised.

41.  Northwest Pipe's breach of contract and negligence caused the Grout Plug Failures and delayed the construction of the Twin Tunnels.

42.  As a result of the breach of contract and negligence of Northwest Pipe, the GVWD has suffered and continues to suffer loss, damage and expense.

\* \* \*

*Damages*

47.  As a result of the negligence, breach of duty and breaches of contract by HMM, Northwest Pipe and SCP, the GVWD has incurred additional and unnecessary cost, including the following:

a.  additional cost to investigate the cause of the Grout Plug Failures;

b.  additional cost to redesign the method for sealing the grout ports of the Steel Liner;

c.  the additional cost to install, remove and then replace the failed grout plugs;

d.  delay in construction of the Twin Tunnels as a result of Grout Plug Failures; and

e.  such further and other particulars as may be provided to the defendants prior to the trial of this action.

*Id.* at 10–11.

On August 5, 2016, NPC tendered a claim to Plaintiffs based on this underlying lawsuit. Dkt. 18-13 at 1. On August 9, 2016, Plaintiffs acknowledged NPC's claim. *Id.* On October 26, 2016, Plaintiffs assumed the defense of NPC under a reservation of rights, including the right "to withdraw from the defense of NPC in regard to the Underlying Lawsuit." Dkt. 18-15.

**B.    Policy Provisions Applicable to Reservation of Rights**

Plaintiffs' reservation of rights letter highlighted potential coverage issues based on the theory that the damage alleged in the underlying litigation may not constitute "property damage" as covered by the policy. Dkt. 18-15 at 8. The policy's applicable coverage provision and relevant definitions are provided below:

**SECTION I – COVERAGES**
**COVERAGE A BODILY INJURY AND PROPERTY DAMAGE LIABILITY**
**1.**    Insuring Agreement
    **a.**    We will pay those sums that the insured becomes legally obligated to pay as damages because of "bodily injury" or "property damage" to which this insurance applies. We will have the right and duty to defend the insured against any "suit" seeking those damages. However, we will have no duty to defend the insured against any "suit" seeking damages for "bodily injury" or "property damage" to which this insurance does not apply. We may, at our discretion, investigate any "occurrence" and settle any claim or "suit" that may result. But:
        **(1)**    The amount we will pay for damages is limited as described in Section III – Limits Of Insurance; and

**(2)** Our right and duty to defend ends when we have used up the applicable limit of insurance in the payment of judgments or settlements under Coverages A or B or medical expenses under Coverage C.

No other obligation or liability to pay sums or perform acts or services is covered unless explicitly provided for under Supplementary Payments – Coverages A and B.

**b.** This insurance applies to "bodily injury" and "property damage" only if:

**(1)** The "bodily injury" or "property damage" is caused by an "occurrence" that takes place in the "coverage territory";

**(2)** The "bodily injury" or "property damage" occurs during the policy period; and

**(3)** Prior to the policy period, no insured listed under Paragraph 1. of Section II — Who Is An Insured and no "employee" authorized by you to give or receive notice of an "occurrence" or claim, knew that the "bodily injury" or "property damage" had occurred, in whole or in part.

\* \* \*

**17.** "Property damage" means:

**a.** Physical injury to tangible property, including all resulting loss of use of that property. All such loss of use shall be deemed to occur at the time of the physical injury that caused it; or

**b.** Loss of use of tangible property that is not physically injured. All such loss of use shall be deemed to occur at the time of the "occurrence" that caused it.

Dkt. 18-1 at 20–21, 34.

Additionally, Plaintiffs' reservation of rights letter stated that coverage may be precluded by any of several exclusions, including: (1) the "Your Product" exclusion, (2) the "Impaired Property" exclusion, and (3) the "Recall" exclusion. *See* Dkt. 18-15 at 8–16. Those exclusions and relevant definitions are set forth in the applicable policy as follows:

**2.** **Exclusions**
This insurance does not apply to:
\* \* \*

**k.      Damage To Your Product**
        "Property damage" to "your product" arising out of it or any part of it.

* * *

**m.      Damage To Impaired Property Or Property Not Physically Injured**
        "Property damage" to "impaired property" or property that has not been physically injured, arising out of:

        **(1)**      A defect, deficiency, inadequacy or dangerous condition in "your product" or "your work"; or

        **(2)**      A delay or failure by you or anyone acting on your behalf to perform a contract or agreement in accordance with its terms.

        This exclusion does not apply to the loss of use of other property arising out of sudden and accidental physical injury to "your product" or "your work" after it has been put to its intended use.

**n.      Recall Of Products, Work Or Impaired Property**
        Damages claimed for any loss, cost or expense incurred by you or others for the loss of use, withdrawal, recall, inspection, repair, replacement, adjustment, removal or disposal of:

        **(1)**      "Your product";

        **(2)**      "Your work"; or

        **(3)**      "Impaired property";

        if such product, work, or property is withdrawn or recalled from the market or from use by any person or organization because of a known or suspected defect, deficiency, inadequacy or dangerous condition in it.

* * *

**8.**      "Impaired property" means tangible property, other than "your product" or "your work", that cannot be used or is less useful because:

        **a.**      It incorporates "your product" or "your work" that is known or thought to be defective, deficient, inadequate or dangerous; or

        **b.**      You have failed to fulfill the terms of a contract or agreement;

        if such property can be restored to use by:

        **a.**      The repair, replacement, adjustment or removal of "your product" or "your work"; or

        **b.**      Your fulfilling the terms of the contract or agreement.

* * *

**21.**      "Your product":

        **a.**      Means:

        **(1)**      Any goods or products, other than real property, manufactured, sold, handled, distributed or disposed of by:

        **(a)**      You;

        **(b)**      Others trading under your name; or

        **(c)**     A person or organization whose business or assets you have acquired; and

        **(2)**     Containers (other than vehicles), materials, parts or equipment furnished in connection with such goods or products.

       **b.**     Includes:

        **(1)**     Warranties or representations made at any time with respect to the fitness, quality, durability, performance or use of "your product"; and

        **(2)**     The providing of or failure to provide warnings or instructions.

       **c.**     Does not include vending machines or other property rented to or located for the use of others but not sold.

Dkt. 18-1 at 21, 24, 32, 34.

## C.    This Lawsuit and the Instant Motions

On February 8, 2017, Plaintiffs filed their complaint in the instant action. Dkt. 1. Plaintiffs seek a declaratory judgment that they owe no duty to defend or indemnify in the underlying dispute between NPC and the Water District. *Id.* at 21.

On March 30, 2017, NPC moved for partial summary judgment on whether Plaintiffs have a duty to defend NPC in the underlying lawsuit. Dkt. 14. On April 13, 2017, Plaintiffs moved for summary judgment. Dkt. 17. On April 20, 2017, NPC moved for a partial stay of this case as it relates to whether Plaintiffs have a duty to indemnify NPC for the damages alleged in the underlying litigation. Dkt. 21.

On May 1, 2017, Plaintiffs responded to the motion to stay. Dkt. 23. Also on that day, the Water District joined in NPC's motion to stay. Dkt. 25. On May 5, 2017, NPC filed a reply in support of its motion to stay. Dkt. 27.

On May 4, 2017, NPC filed a motion for leave to amend its answer to the complaint and to assert new counterclaims. Dkt. 26.

On May 12, 2017, NPC and the Water District responded to Plaintiffs' motion for summary judgment. Dkts. 28, 29. Also on May 12, 2017, Plaintiffs responded to NPC's motion for partial summary judgment. Dkt. 31.

On May 15, 2017, Plaintiffs filed a response to NPC's motion for leave to amend its answer. Dkt. 33. Although Plaintiffs stated that their position was one of "non-opposition" to the motion for leave to amend, their response nonetheless asserted that the proposed amendments would be futile. *Id.*

On May 26, 2017, NPC and Plaintiffs filed replies on their respective motions for summary judgment. Dkts. 36, 37.

## II.    DISCUSSION

**A.    Motion to Stay**

The Court begins its analysis by addressing NPC's and the Water District's joint motion for a partial stay. Defendants argue that the Court should partially stay these proceedings to the extent that they relate to whether Plaintiffs owe a duty to indemnify NPC in the underlying litigation. Their motion is based on a theory that is a reoccurring theme throughout their briefings: namely, the distinction between the duty to defend and the duty to indemnify. *See* Dkt 14; Dkt. 21; Dkt. 29 at 2–6.

It is well-established Washington law "that the duty to defend is different from and broader than the duty to indemnify." *Am. Best Food, Inc. v. Alea London, Ltd.*, 168 Wn.2d 398, 405 (2010), *as corrected on denial of reconsideration* (June 28, 2010) (citing *Safeco Ins. Co. of Am. v. Butler*, 118 Wn.2d 383, 392 (1992)). While "[t]he duty to indemnify exists only if the policy *actually covers* the insured's liability[,] [t]he duty to

defend is triggered if the insurance policy *conceivably covers* allegations in the complaint." *Id.* (citing *Woo v. Fireman's Fund Ins. Co.*, 161 Wn.2d 43, 53 (2007)) (emphasis in original). However, while the duty to defend is distinctly broader than the duty to indemnify, both are derivative of the same underlying concept: coverage under the applicable policy. "When the facts or the law affecting coverage is disputed, the insurer may defend under a reservation of rights until *coverage* is settled in a declaratory action." *Am. Best Food*, 168 Wn.2d at 405 (emphasis added). Because this is just such a declaratory action, the issue before the Court is whether coverage exists under the applicable policy for the various claims in the underlying litigation. This issue is dispositive of both the duty to defend and the duty to indemnify.

Indeed, the fact that the duty to defend is implicated by the timing of this lawsuit is important to the Court's analysis, as it refines the lens through which the Court may view the issue of coverage. For instance, because the underlying litigation is unresolved, the duty to defend is ongoing and the Court's review must generally be limited to "look[ing] at the 'eight corners' of the insurance contract and the underlying complaint." *Nat'l Union Fire Ins. Co. of Pittsburgh, PA v. Coinstar, Inc.*, 39 F. Supp. 3d 1149, 1156 (W.D. Wash. 2014). Nonetheless, the distinction between the duties to defend or indemnify is not so profound, by itself, to justify staying the Court's analysis of one duty while addressing the other. Contrary to the Defendants' assertions, analysis of whether the allegations in the underlying lawsuit implicate covered property damage will not prejudice them in any way. Accordingly, the motion to stay is denied.

**B.    Motion to Strike**

Plaintiffs move to strike certain portions of NPC's response to Plaintiffs' motion for summary judgment, claiming that they are unsupported by affidavit or citation to any evidence in the record. Dkt. 37 at 1–3.

First, Plaintiffs seek to strike NPC's description of the circumferential welds as material supplied by Seymour-Cap Partnership ("SCP") that is separate from the grout plugs and steel liner manufactured and supplied by NPC. *See* Dkt. 29 at 8:13–19, 9:9–10, 9:22–10:2. However, NPC's statements are clearly supported by the underlying complaint, which describes how SPC was responsible for supplying the "labour, equipment and materials" to perform the installation of the grout plugs, including welding the grout plugs to seal the steel liner. Dkt. 18-12 at 8.

Second, Plaintiffs move to strike NPC's argument that the steel liner became real property once it was cemented into the Twin Tunnels project. *See* Dkt. 29 at 11:10–17, 12:16–13:6, 14:13–19. This argument was properly supported by the affidavit of Brent Keil, Dkt. 30, which was properly cited by NPC in its argument, Dkt. 29 at 12. Although NPC could have done a better job citing the affidavit after each instance that it relied on the statements therein, it is clear that NPC's argument is supported by affidavit and citation. Regardless, the assertions about the steel liner as real property do not affect the outcome of the Court's analysis, as the Court concludes below that any conceivably alleged damages to the steel liner are excluded under the "impaired property" exclusion.

Therefore, the Court denies Plaintiffs' motion to strike.

**C.     Motions for Summary Judgment**

**1.     Summary Judgment Standard**

Summary judgment is proper only if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). The moving party is entitled to judgment as a matter of law when the nonmoving party fails to make a sufficient showing on an essential element of a claim in the case on which the nonmoving party has the burden of proof. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). There is no genuine issue of fact for trial where the record, taken as a whole, could not lead a rational trier of fact to find for the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp*., 475 U.S. 574, 586 (1986) (nonmoving party must present specific, significant probative evidence, not simply "some metaphysical doubt"). *See also* Fed. R. Civ. P. 56(e). Conversely, a genuine dispute over a material fact exists if there is sufficient evidence supporting the claimed factual dispute, requiring a judge or jury to resolve the differing versions of the truth. *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 253 (1986); *T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987).

In this case, the parties dispute whether coverage exists under the applicable insurance policy for the damages alleged in the underlying lawsuit between NPC and the Water District. "Summary judgment in an insurance coverage case should be granted where (1) there is no dispute about the facts and (2) coverage depends solely on the language of the insurance policy." *Stouffer & Knight v. Cont'l Cas. Co.*, 96 Wn. App.

741, 747 (1999). The interpretation of insurance policies is generally a question of law to be decided by the court. *Quadrant Corp. v. Am. States Ins. Co.*, 154 Wn.2d 165, 171 (2005). However, where a material provision of a contract is ambiguous, "[d]etermining a contractual term's meaning involves a question of fact and examination of objective manifestations of the parties' intent." *Martinez v. Miller Indus., Inc.*, 94 Wn. App. 935, 943 (1999).

Because the parties' dispute is before the Court at a time when the underlying lawsuit remains unresolved, the Court's review is generally limited to the "eight corners" of the applicable insurance policy and the complaint from the underlying lawsuit. *See Nat'l Union Fire Ins. Co.*, 39 F. Supp. 3d at 1156. Reviewing those two documents, "[o]nly if the alleged claim is clearly not covered by the policy is the insurer relieved of its duty to defend." *Truck Ins. Exch. v. Vanport Homes, Inc.*, 147 Wn.2d 751, 760 (2002) (citing *Kirk v. Mt. Airy Ins. Co.*, 134 Wn.2d 558, 561 (1998)). Nonetheless:

> if the allegations in the complaint conflict with facts known to the insurer or if the allegations are ambiguous, facts outside the complaint may be considered. However, these extrinsic facts may only be used to trigger the duty to defend; the insurer may not rely on such facts to deny its defense duty.

*Expedia, Inc. v. Steadfast Ins. Co.*, 180 Wn.2d 793, 803–04 (2014), *as corrected* (Aug. 6, 2014) (internal citations omitted). Also, to the extent that any exclusions contained in the insurance contract are implicated by allegations from the underlying lawsuit, those "[e]xclusionary clauses contained in insurance policies are strictly construed against the insurer." *Id.* at 747–48 (quoting *Allstate Ins. Co. v. Raynor*, 93 Wn. App. 484, 492 (1999)).

### 2. Coverage

Plaintiffs argue that they are entitled to summary judgment on the basis that the Water District's complaint in the underlying lawsuit does not allege any "property damage" as defined by the insurance policy. Alternatively, Plaintiffs argue that even if property damage was alleged in the underlying litigation, coverage is precluded by several policy exclusions. NPC argues the inverse: namely, that it is entitled to partial summary judgment on the issue of the duty to defend because the underlying lawsuit alleges "property damage" covered by the policy and none of the exclusions cited by the Plaintiffs otherwise bar coverage under the policy.

### a. "Property Damage" in Underlying Complaint

In determining whether the underlying lawsuit gives rise to a duty under the policy, the threshold inquiry is whether the underlying lawsuit alleges any damages that could result in liability.

As outlined in the facts above, the applicable coverage under NPC's general commercial liability policy with Plaintiffs extends to "property damage." *See* Dkt. 18-1 at 20–21. The policy defines "property damage" as:

> **a.** Physical injury to tangible property, including all resulting loss of use of that property. All such loss of use shall be deemed to occur at the time of the physical injury that caused it; or
> **b.** Loss of use of tangible property that is not physically injured. All such loss of use shall be deemed to occur at the time of the "occurrence" that caused it.

Dkt. 18-1 at 34.

The primary thrust of the Water District's lawsuit is to recover for the expenses incurred due to delay in the Twin Tunnels project. Dkt. 18-12 at 11. The parties do not dispute that such damages are not covered under the policy as "property damage." *See* Dkt. 17 at 12–14; Dkt. 29 at 7.

However, in addition to damages arising from delay and breach of contract, the underlying complaint also claims damages of the "additional cost to install, remove, and then replace the failed grout plugs." Dkt. 18-12 at 11. In the context of the facts alleged in the underlying complaint, this sentence can be construed as claiming damages associated with repairs resulting from physical damage to the steel liner, the grout plugs themselves, and the circumferential welds used to seal the grout plugs to the steel liner. *See id.* at 8, 11. Such alleged damages satisfy the "property damage" definition of "physical injury to tangible property." Accordingly, the Court concludes that the underlying lawsuit has alleged "property damage" as defined in the applicable policy.

### b. Exclusions

Although the underlying lawsuit against NPC alleges at least some "property damage," this does not end the Court's analysis. The Court must further determine whether coverage of the alleged "property damage" is barred by any of the policy's exclusions. Plaintiffs argue that coverage for the "property damage" alleged in the underlying lawsuit is barred by three of the policy's exclusions: (1) the "your product" exclusion, (2) the "impaired property" exclusion, and (3) the "recall" exclusion.

### i. "Your Product" Exclusion

The "your product" exclusion provides that any "property damage" to "your product" arising out of the product is not covered by the policy. Dkt. 18-1 at 24. "Your product" is defined as "[a]ny goods or products, other than real property, manufactured, sold, handled, distributed or disposed of by" the insured, including any "[w]arranties or representations made at any time with respect to the fitness, quality, durability, performance or use of 'your product.'" Dkt. 18-1 at 34.

Of the property that allegedly suffered damage, both the steel liner and grout plugs were manufactured and supplied to the Water District by NPC. *See* Dkt. 18-12 at 7. Plaintiffs argue that this fact renders those alleged damages subject to the "your product" exclusion. Dkt. 17 at 17–20. The parties do not dispute that the grout plugs constitute "your product" under the policy. Therefore, any damage to the grout plugs is not covered. However, NPC argues that (1) the steel liner ceased to be "your product" once it was integrated into the larger project, and (2) the steel liner constituted real property which is not subject to the "your product" exclusion. Dkt. 14 at 11–12; Dkt. 29 at 10–13.

The Court summarily rejects NPC's first argument. There is nothing in the policy to suggest that property qualifying as "your product" ceases to qualify as such merely because possession is transferred to another party and the product is incorporated into another project. In fact, to the contrary, the "impaired property" exclusion and definition clearly indicates that the "your product" designation continues even after the product becomes incorporated into a larger work. *See* Dkt. 18-1 at 32.

NPC's second argument is more convincing:

What would otherwise be an insured manufacturer's product, or an insured material supplier's product, may lose that designation once it is incorporated into a building project if it thereby becomes real property under that jurisdiction's law of fixtures. In such cases, *if property damage to it occurs after being built into the project, it no longer fits within the definition of "your product," so the exclusion should not apply*.

Scott C. Turner, *Insurance Coverage of Construction Disputes* § 27:10 (2d ed.) (emphasis added). The Ninth Circuit has relied upon this rule, albeit in an unpublished decision. *Mid-Continent Cas. Co. v. Titan Const. Corp.*, 281 F. App'x 766, 768–69 (9th Cir. 2008) (quoting *Black's Law Dictionary*, 1254 (8th ed. 2004)) ("Since 'real property' is not defined in the CGL, we adopt the common meaning of the term, 'land and anything growing on, attached to, or erected on it, excluding anything that may be severed without injury to the land.'"). Other courts have likewise reached the same conclusion. *See Scottsdale Ins. Co. v. Tri-State Ins. Co. of MN.*, 302 F. Supp. 2d 1100, 1104–08 (D.N.D. 2004).

Under long-established Washington law,[1] "[t]he criteria for a fixture are: (1) [a]ctual annexation to the realty, or something appurtenant thereto; (2) application to the use or purpose to which that part of the realty with which it is connected is appropriated; and (3) the intention of the party making the annexation to make a permanent accession

---

[1] The Court notes that the Twin Tunnels project is located in Vancouver, British Columbia. *See* Dkt. 18-12 at 5. Therefore, it is questionable whether the Court should look to Washington State law in determining whether the steel liner constitutes real property for the purpose of analyzing the "your product" exclusion. Nonetheless, NPC has argued the issue in the context of Washington state law and Plaintiffs have failed to offer any substantive rebuttal. *See* Dkt. 29 at 12–13; Dkt. 37 at 9–10. Indeed, both parties appear to cite generally to Washington state law throughout their numerous briefs on the instant motions and, while not briefed by the parties, the applicable policy may include choice of law provisions that designate Washington state law as controlling. Therefore, the Court construes the parties' repeated reference to Washington authorities and their silence on the choice of law as a concession that the Court's analysis is governed by Washington state law.

to the freehold." *Liberty Lake Sewer Dist. No. 1 v. Liberty Lake Utilities Co.*, 37 Wn. App. 809, 813 (1984). Upon installation of the grout plugs, the steel liner was cemented into the underground Twin Tunnels project. Dkt. 30 at 2. This establishes that the steel liner was sufficiently annexed to the realty to satisfy the first prong of the fixture criteria. Additionally, there is no dispute that the steel liner was applied to the purpose of the Twin Tunnels project for which the portion of realty is appropriated. *See* Dkt. 30; Dkt. 18-12 at 5. Finally, the underlying complaint by the Water District states that the steel liner was "installed at the ends of each of the tunnels *as a permanent lining* . . . that prevents water from travelling into or out of the tunnels," thereby establishing the third prong of the fixture criteria. Dkt. 18-12 at 5 (emphasis added). Pursuant to this analysis, the steel liner is real property, or at least it was real property at the time that the alleged defects resulted in the failure of the circumferential welds.

In their reply, Plaintiffs also argue that NPC's representation of the steel liner as real property is "based entirely on an unsupported paragraph regarding the timing and status of the overall project at the time that the defects in the grout plugs were identified." Dkt. 37 at 9 (citing Dkt. 29 at 11). However, this argument completely ignores NPC's two-page substantive argument regarding the nature of the steel liner as real property under Washington law, which was properly supported by affidavit. *See* Dkt. 29 at 11–13 (citing Dkt. 30). NPC has presented credible evidence to show that the steel liner constituted real property at the time the grout plugs were installed, *see* Dkt. 30, and Plaintiffs have failed to offer any substantive rebuttal to NPC's argument or evidence, *see* Dkt. 37.

The Court notes that Washington courts have previously held that buildings constitute a "product" for the purposes of a "product" exclusion, relying upon policy preferences against interpreting a commercial general liability policy as one would a performance bond. *See, e.g.*, *Mut. of Enumclaw Ins. Co. v. Patrick Archer Const., Inc.*, 123 Wash. App. 728, 733 (2004). Under such a principle, the steel liner would likewise qualify as a product subject to an exclusionary clause. This would align with the common meaning of the term "product" as "goods which are processed or assembled in the ordinary channels of commerce," under which the steel liner and grout plugs would clearly qualify as a product of NPC. *Westman Indus. Co. v. Hartford Ins. Grp.*, 51 Wash. App. 72, 78 (1988). However, unlike the policy here, the policies in those Washington cases did not include a contractual definition of the term "your product." *See id.* at 733 ("'Products' itself is not defined in the policy."). In this case, the policy expressly exempts real property from the "your product" definition. Dkt. 18-1 at 34. ("your product" constitutes "[a]ny goods or products, *other than real property* . . . .") (emphasis added). The Court is required to strictly construe such language in favor of the insured. *Expedia, Inc.*, 180 Wn.2d at 747–48. Accordingly, because the steel liner was real property at the time the alleged underlying defect caused the grout plug failures, the Court concludes that it is not "your product" as defined by the policy.

Additionally, the complaint alleges that defects caused the failure of the circumferential welds intended to create a waterproof seal between the grout plugs and the steel liner. Dkt. 18-12 at 8. ("During the original installation of the grout plugs, SCP experienced multiple failures of the circumferential welds used to seal the grout plugs to

the Steel Liner."). The parties do not dispute that the circumferential welds are not the product of NPC. Therefore, the "your product" exclusion does not apply to any damage to the welds.

The Court concludes that, to the extent the underlying lawsuit alleges damages to the steel liner arising from a defect therein, the "your product" exclusion does not bar coverage. It is somewhat unclear from the underlying complaint whether the Water District actually seeks to recover for physical damages to the steel liner or the welds. The underlying complaint does not expressly set forth that any of them were damaged or destroyed. Nonetheless, the damages section of the underlying complaint does generally claim "the additional cost to install, remove and then replace the failed grout plugs" and "such further and other particulars as may be provided to the defendants prior to the trial of this action." Dkt. 18-12 at 11. These claimed damages could reasonably include damages arising from actual damage to the steel liner or welds. The fact that the underlying complaint *conceivably* alleges damage to property not subject to the "your product" exclusion is sufficient for the purpose of the Court's analysis into whether the "your product" exclusion precludes coverage in the context of the duty to defend.

### ii. "Impaired Property" Exclusion

Plaintiffs also argue that coverage is barred under the policy's "impaired property" and "recall" exclusions. Dkt. 17 at 20–24. The "impaired property" exclusion bars coverage for damage to property that incorporates "your product" "if such property can be restored to use by . . . [t]he repair, replacement, adjustment or removal of 'your product.'" Dkt. 18-1 at 24, 32. Similarly, it bars coverage for damages that result from a

failure to fulfill the terms of service on a contract if the damaged property can be restored

to use by fulfilling the terms of the contract. *Id.*

The underlying complaint indicates that the grout plugs, circumferential welds,

and steel liner were all incorporated together in order to seal the grout ports that held the

steel liner in place. *See* Dkt. 18-12. The fact that the "steel liner" constituted real property

at the time of the occurrence is irrelevant to the Court's analysis of the "impaired

property" exclusion because, unlike the "your product" definition, the "impaired

property" definition does not exclude real property. Accordingly, both the circumferential

welds and the steel liner constitute "impaired property" excluded from coverage if they

can be "restored to use" by the removal and replacement of the grout plugs.

The underlying complaint does not seek any damages resulting to the steel liner

other than the "cost to install, remove, and then replace the failed grout plugs." Dkt. 18-

12 at 11. This indicates that replacement of the failed grout plugs would restore the steel

liner to use. NPC has failed to present any extrinsic evidence to the contrary. Therefore,

the Court concludes that any alleged damage to the steel liner as a result of the grout plug

failure constitutes damage to "impaired property" subject to exclusion.

While the facts in the underlying complaint show that the steel liner is

permanently installed as "impaired property" that will be restored to use by the

replacement of the failed grout plugs, the same cannot be said of the "failed"

circumferential welds that were intended to seal the grout plugs and the steel liner. As

illustrated in *Dewitt Const. Inc. v. Charter Oak Fire Ins. Co.*, 307 F.3d 1127, 1134 (9th

Cir. 2002), *as amended on denial of reh'g and reh'g en banc* (Dec. 4, 2002), the

"impaired property" exclusion does not bar coverage if tangible property was destroyed in the removal process and not subsequently restored. It cannot be concluded from the underlying complaint that the replacement of the grout plugs will allow the failed welds to be restored to use. Accordingly, because it is conceivable under the allegations of the complaint that the replacement of the grout plugs will not restore the failed circumferential welds to use, the "impaired property" exclusion cannot be used to refute Plaintiffs' duty to defend as it pertains to alleged damages to the circumferential welds.

### iii. "Recall" Exclusion

Plaintiffs also argue that coverage for the damages alleged in the underlying complaint are prohibited by the "recall" exclusion. Dkt. 17 at 23–24. The "recall" exclusion (commonly referred to as a "sistership" exclusion) bars coverage for damages resulting from the recall or withdrawal of "your product" or "impaired property" because of a known or suspected defect. Dkt. 18-1 at 24. The Court need not consider this argument as it may apply to damages to the steel liner or grout plugs, as those damages are already precluded under the "your product" and "impaired property" exclusions. To the extent that Plaintiffs rely on this exclusion to challenge coverage for any alleged damage to the circumferential welds, the Court rejects this argument. Any damage to the welds occurred at the time the alleged defects resulted in their failure. Such damage is not resultant to "the loss of use, withdrawal, recall, inspection, repair, replacement, adjustment, removal or disposal" of any product.

### c. Conclusion

Pursuant to the above analysis, the Court concludes that the only aspect of the underlying litigation conceivably covered by the policy is any alleged "property damage" to the circumferential welds. That "property damage" could come in the form of either physical injury or loss of use, as either is conceivable under the allegations set forth in the underlying complaint. However, to the extent that the underlying lawsuit seeks to recover any other damages, those damages either fail to qualify as "property damage" or are subject to exclusion.

Before the Court issues an order based on this finding, it requests that the parties submit supplemental briefing. The parties have not yet addressed how the Court should proceed in regards to the duty to defend when presented with a "mixed" lawsuit such as this, comprised of both covered and uncovered claims. In some jurisdictions, such as California, "[i]f any claim alleged in a lawsuit could be potentially covered under the policy, the insurer is obligated to defend against all claims alleged, even if some of those claims could not even potentially be covered, and even if such non-covered claims predominate." *Los Osos Cmty. Servs. Dist. v. Am. Alternative Ins. Corp.*, 585 F. Supp. 2d 1195, 1202 (C.D. Cal. 2008). However, at least one Washington decision strongly suggests that "mixed" lawsuits do not require the insurer to defend the entire lawsuit if an "effective means exists for prorating the costs of defense between the claims for which the defendant insurer provided no coverage from those which it did cover." *Nat'l Steel Const. Co. v. Nat'l Union Fire Ins. Co. of Pittsburgh*, 14 Wn. App. 573, 576 (1975). In their supplemental briefing, the parties will address how the Court should tailor its final

order, particularly in relation to the duty to defend, in light of its conclusion that the only claim conceivably covered by the policy is that for property damage to the circumferential welds.

**D.      Motion for Leave to Amend Answer**

NPC has also moved for leave to amend its answer. Dkt. 26. Leave to amend an initial pleading may be allowed by leave of the court and "shall freely be given when justice so requires." *Foman v. Davis*, 371 U.S. 178, 182 (1962); Fed. R. Civ. P. 15(a). Granting leave to amend rests in the discretion of the trial court. *Internat'l Ass'n of Machinists & Aerospace Workers v. Republic Airlines*, 761 F.2d 1386, 1390 (9th Cir. 1985). In determining whether amendment is appropriate, the Court considers five potential factors: (1) bad faith, (2) undue delay, (3) prejudice to the opposing party, (4) futility of amendment, and (3) whether there has been previous amendment. United States v. Corinthian Colleges, 655 F.3d 984, 995 (9th Cir. 2011). The Court's decision is guided by the established practice of permitting amendments with "extreme liberality" in order to further the policy of reaching merits-based decisions. *DCD Programs Ltd. v. Leighton*, 833 F.2d 183, 186 (9th Cir. 1987). In light of this policy, the nonmoving party generally bears the burden of showing why leave to amend should be denied. *Genentech, Inc. v. Abbott Labs.*, 127 F.R.D. 529, 530-31 (N.D. Cal. 1989).

Plaintiffs have filed a brief in response to the motion for leave to amend. Dkt. 33. Although the Plaintiffs suggest that the proposed amendment is futile, they have adopted a position of "non-opposition." *Id.* Amendment is futile "only if no set of facts can be proved under the amendment to the pleadings that would constitute a valid and sufficient

claim or defense." *Miller v. Rykoff Sexton, Inc.*, 845 F.2d 209, 214 (9th Cir. 1988). The Court concludes that the burden of proof for showing futility, which falls on the nonmoving party, has not been satisfied because Plaintiffs have elected to forego substantive argument in opposition to the proposed amendment.

Nonetheless, the Court notes that its decision in this order may substantially change both parties' positions on whether amendment is warranted. Therefore, before the Court issues a ruling on the motion for leave to amend, the Court asks that the parties submit additional briefing on whether leave to amend should be granted in light of this order.

### III.   ORDER

Therefore, it is hereby **ORDERED** as follows:

1.      The motion to stay proceedings (Dkt. 21) is **DENIED**;

2.      The Court **RESERVES RULING** on NPC's motion to file an amended answer (Dkt. 26);

3.      The Court **RESERVES RULING** on the parties' motions for summary judgment (Dkts. 14, 17);

4.      The parties may submit simultaneous supplemental briefs, not to exceed twelve (12) pages total, on the issues of the duty to defend and whether leave to amend NPC's answer should be granted. The briefs shall be submitted no later than July 7, 2016. The parties may also submit supplemental replies, not to exceed six (6) pages, no later than July 14, 2017.

1      5.     The Clerk shall renote the motions for summary judgment (Dkts. 14, 17)

2   and the motion for leave to amend (Dkt. 26) for consideration on July 14, 2017.

3          Dated this 22nd day of June, 2017.

4

5                                                    _____
                                            BENJAMIN H. SETTLE

6                                           United States District Judge

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22